[S.F. No. 23592. Dec. 9, 1977.]

MICHAEL C. VARJABEDIAN et al., Plaintiffs and Appellants, v. CITY OF MADERA, Defendant and Appellant.

**COUNSEL**

Sherwood & Denslow Green for Plaintiffs and Appellants.

Axel E. Christiansen, City Attorney, Parichan, Krebs, Renberg & Eldridge, Parichan, Renberg & Crossman and Bartow & Christiansen for Defendant and Appellant.

**OPINION**

**MOSK, J.**—Defendant City of Madera appeals from a judgment awarding plaintiffs approximately $73,000 for damages caused by the city's operation of a sewage treatment plant near plaintiffs' property. Recovery was on a nuisance theory. Plaintiffs cross-appeal from a

judgment on the pleadings for defendant on plaintiffs' cause of action in inverse condemnation.

We conclude that the court erred in its instructions on the measure of nuisance damages, but the error was not prejudicial. Defendant's other allegations of error are not meritorious, and thus the judgment on the nuisance theory must be affirmed. However, defendant's motion for judgment on the pleadings on the inverse condemnation claim should have been denied, and therefore the judgment on that count must be reversed.[1]

Plaintiffs Michael and Judith Ann Varjabedian acquired a vineyard of approximately 80 acres in Madera County, and in 1971 moved onto the property with their 3 children. In 1972 defendant city began operation of a new waste water treatment plant on land located some 600 feet from plaintiffs' residence. The plant emits odors which are blown onto plaintiffs' property by the prevailing winds.

The Varjabedians noticed septic smells on their property as soon as sewage was delivered to the new plant in June 1972. There followed a lengthy period during which they repeatedly complained of the odors to city officials and were told that corrective efforts were being made and assured that the plant would eventually be odor-free. On advice of counsel, Michael Varjabedian began to keep a log of the occurrence and intensity of the smells, and of his attempts to persuade the city to remedy the situation. Finally, in July 1973 the instant lawsuit was filed against the city by all five family members.

In their complaint, plaintiffs set forth four theories of recovery: negligence in the design, construction and operation of the plant; maintenance of a nuisance; maintenance of a dangerous and defective condition; and inverse condemnation. When the case came to trial in June 1974, plaintiffs voluntarily dismissed the causes of action for

---

[1]The motion for judgment on the pleadings was orally granted at the outset of trial. A minute order to this effect was entered, but the ruling was not carried over into the formal judgment recorded in the judgment book. Although the minute order was not appealable (*Old Town Dev. Corp.* v. *Urban Renewal Agency* (1967) 249 Cal.App.2d 313, 317 [57 Cal.Rptr. 426]), the court's failure to include a dismissal of the cause of action in inverse condemnation in the judgment on the verdict was inadvertent. In addition, the issues presented by the challenged ruling are briefed and ready for decision. In these circumstances it is appropriate to preserve the appeal by amending the judgment to reflect the manifest intent of the trial court, and we shall so order. (*Tenhet* v. *Boswell* (1976) 18 Cal.3d 150, 153-155 [133 Cal.Rptr. 10, 554 P.2d 330], and cases cited.)

negligence and maintenance of a defective condition.[2] The remaining two counts were the object of defendant's motion for judgment on the pleadings. The trial judge granted the motion as to the inverse condemnation theory, stating his belief that recovery on that cause required "physical damage to the property."

As to the nuisance cause of action the motion was denied, and the case went to trial on that theory. Plaintiffs sought recovery for permanent diminution in the value of their property caused by the nuisance, as well as compensation for personal discomfort. (*Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271-275 [288 P.2d 507].) They further sought special damages for the anticipated loss of a Cal-Vet loan (Mil. & Vet. Code, § 984 et seq.) which financed the purchase of the bulk of the vineyard. In support of this claim, plaintiffs contended they would be compelled to move off the property and would therefore forfeit their loan under Military and Veterans Code section 987.2.[3] Damages were requested to cover the cost of refinancing the land purchase at a higher rate.

The jury returned a verdict for plaintiffs awarding damages as follows: $32,000 to the Varjabedians for the loss in value of their real property; $30,000 special damages for loss of the Cal-Vet loan; and $11,000 other damages distributed among the five named plaintiffs.

I

Defendant relies upon alleged error in the instructions to the jury regarding the measure of property damage for which the city could be liable in nuisance.[4] The challenged instruction read: "In determining the compensation, if any, to be awarded Plaintiffs for damage to their property proximately caused by a permanent nuisance, in addition to

---

[2] A cross-complaint by the city against the designers and builders of the plant, as well as cross-complaints between those cross-defendants, were severed for purposes of trial and are not before us on this appeal.

[3] Military and Veterans Code section 987.2 reads, in relevant part, "The contract made between the department and purchaser shall provide that the purchaser maintain the farm or home as his place of residence . . . ." A waiver of the occupancy requirement "for a period not to exceed four years on a showing of good cause" is provided in section 986.35.

[4] Civil Code section 3479 provides in pertinent part, "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance."

other damage as to which I have instructed you or will instruct you, they are entitled to recover the difference, if any, in the present fair market value of the property as the same would have been without the construction of the sewage treatment plant by the City of Madera, and the present fair market value after said plant was constructed and put into operation."

This instruction, defendant urges, allowed the jury to include in its calculation of damages a loss of real property value caused by city operations which by statute do not constitute a nuisance. Civil Code section 3482 provides that "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance," and the construction of sewage treatment plants by cities such as Madera is admittedly authorized by statute. (See Gov. Code, §§ 39040,[5] 40404, 43601, 43602, 54301, 54309, 54309.1, and 54341.)

However, the exculpatory effect of Civil Code section 3482 has been circumscribed by decisions of this court. In *Hassell* v. *San Francisco* (1938) 11 Cal.2d 168, 171 [78 P.2d 1021], we said: " 'A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury.' " This interpretation was reiterated in *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 938 [101 Cal.Rptr. 568, 496 P.2d 480], and we adhere to it in the case at bar. A requirement of "express" authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability.[6]

---

[5]Section 39040 of the Government Code was repealed by Statutes 1974, chapter 426, section 3, page 1023. (See Cal. Law Revision Com. com. to Gov. Code, §§ 39040-39374, 35 West's Ann. Gov. Code (1977 supp.) p. 69.)

[6]In support of its interpretation of section 3482, the city relies on *Lombardy* v. *Peter Kiewit Sons' Co.* (1968) 266 Cal.App.2d 599, 605 [72 Cal.Rptr. 240]. In *Lombardy,* the plaintiff complained inter alia of the fumes from a nearby freeway, for which he sought nuisance damages. The court sustained a judgment on demurrer for the defendants, citing section 3482. However, the test of authorization stated in *Hassell* requires a particularized assessment of each authorizing statute in relation to the act which constitutes the nuisance. Accordingly, generalizations drawn from statutes authorizing highway construction may not be applicable to municipal waste water treatment

■ Applying the foregoing standard, we reject defendant's theory that the general authorization of municipal construction of sewage plants "expressly" sanctions the production of any particular level of odors within the meaning of section 3482. None of the Government Code statutes under which the city claims to act mentions the possibility of noxious emanations from such facilities. Nor can we find that such odors were authorized by the "plainest and most necessary implication" from the general powers there conferred, or that it can be fairly said that the Legislature contemplated, to any extent, the creation of a malodorous nuisance when it authorized sewage plant construction. Indeed, one object of such plants is to *remove* harmful and obnoxious effluents from the environment.

■ Defendant argues, however, that the instruction also allowed the jury to consider effects of the sewage plant on the market value of the Varjabedians' property caused by aspects of the plant other than its production of odors. It is true that under the instruction, which simply calls for a comparison of the market value of the Varjabedians' land before and after the construction of the plant, the jury could have considered decreases in market value provoked by such considerations as the unappealing aesthetic qualities of the sewer plant or anxiety caused by mere knowledge of its proximity. Undoubtedly, not all of such factors fall within the definition of nuisance (fn. 4, *ante*); in those respects, therefore, the instruction failed to satisfy the requirements of the law of nuisance quite apart from any issue of statutory authorization under Civil Code section 3482.[7] To the extent that any of the factors did constitute a nuisance but were expressly authorized by statute, the instruction erred in allowing their inclusion in the measure of damages.

We decline to speculate, however, on which of the potentially depressive effects of sewer plant construction on property values—other than odors—constitute nuisances, or if nuisances, which are expressly authorized, because of our belief that any error in the instruction in this case was not prejudicial to defendant. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) There was no evidence of negative impact on plaintiffs' property value, to which the jury was exposed, which did not

operations. We need not determine here whether *Lombardy* errs in applying the standard adopted in *Hassell.*

[7]To avoid this error, the instruction should have directed a comparison of the market value of the property before and after the creation of the nuisance, rather than before and after the construction of the plant.

relate directly to the odors. The only testimony regarding the nonolfactory impact of the sewer plant was that of defendant's expert, one Freeman, who estimated that in the absence of constant foul odors there was no depreciation of the farmland. The testimony of plaintiff's expert, one Salaberry, that the sewage plant had caused a depreciation of $56,000 was based solely on the existence of the smells. Indeed, the court kept Salaberry's written report from the jury because it contained language which might have misled the jury into estimating damages before and after the construction of the plant rather than before and after the emission of odors. And although the challenged instruction gave some sanction to the jury's consideration of precisely the same erroneous comparison, this tendency was minimized by other instructions which tied damages to those proximately caused by a permanent nuisance.[8] In the light of the evidence and the totality of the court's instructions, the potential for prejudice contained in the erroneous instruction on damages was minimal. We do not believe the error was "likely to mislead the jury and thus become a factor in its verdict." (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].)

## II

Defendant further contends that the awards of damages for loss in value of the Varjabedians' real property and for the personal discomfort of the individual plaintiffs were unsupported by the evidence. To the contrary, the record reveals substantial evidence to sustain the verdict in this regard. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) ■ The testimony of each of the plaintiffs as to the discomfort caused by the smells was corroborated by several witnesses, while the continuing occurrence of the stench was documented in tedious detail by Michael Varjabedian's recollection fortified by his log. The intensity of the odors found reflection in log notations ranging from "smell" to "very bad" to "horrible." Even when classified as mere "smell," plaintiff testified that the aroma was offensive enough to destroy the comfort and enjoyment of his home and property. At other times "it

---

[8]Thus the general instructions read to the jury on the issue of damages contained the statement, "If, under the Court's instructions you find that Plaintiffs, or any of them, are entitled to a verdict against Defendant, City of Madera, you must award such Plaintiff damages in an amount that will reasonably compensate him or her for each of the following elements of claimed loss or harm, *provided that you find that it was, or will be suffered by him or her and proximately caused by the Defendant by the maintenance of a permanent nuisance* as hereinbefore defined." (Italics added.)

was about as much as a person could stand, you could not be in it too long. You would have to go somewhere for relief."[9] Physical reactions of plaintiffs included burning of the eyes and nausea. From this evidence the jury could have concluded that a nuisance existed which was permanent in nature. (*Kornoff* v. *Kingsburg Cotton Oil Co.* (1952) *supra,* 45. Cal.2d 265, 268-271.)

■ As for the depreciation in the value of the land, plaintiffs' expert estimated the decline at $56,000, nearly twice the jury's ultimate award. While defendant objects to the inclusion in this figure of the loss incurred if the premises were uninhabitable and hence salable only to an absentee farmer, it appears this factor would appropriately be considered by a prospective purchaser and could properly be included in the estimated decline in market value.

Defendant accompanies its claim of evidentiary insufficiency with an allegation of excessive damages. This contention was initially presented to the trial court and rejected, in connection with defendant's motion for a new trial. The judge's decision in this respect is entitled to great weight. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) Upon review of the record, we do not find the awards for either the loss of real property value or the personal discomfort of plaintiffs to be excessive.

### III

■ Defendant next asserts that plaintiffs' recovery for the anticipated loss of their Cal-Vet loan was speculative and therefore improper (Civ. Code, § 3283).[10] The trial court treated the certainty of the future loss of the loan as a question of fact for the jury, and instructed as follows: "If, under the evidence you should find that there is a permanent nuisance,

[9]The testimony is reminiscent of Shakespeare's description in The Merry Wives of Windsor: "The rankest compound of villanous smell that ever offended nostril."

[10]Defendant relies on *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 367-368 [28 Cal.Rptr. 357], and *Engle* v. *City of Oroville* (1965) 238 Cal.App.2d 266 [47 Cal.Rptr. 630]. *Frustuck* indeed states the rule on speculative damages, but presents an inapposite factual situation in that the appellate court found no evidence of damage to the plaintiff's property resulting from increased flowage of water across that property. In *Engle,* the plaintiffs claimed damages for loss of prospective profits from a motel which had yet to be built and for which they had no contractual arrangement or financial backing—damages considerably more speculative than those the Varjabedians face regarding loss of their loan.

and if you further find that it is reasonably certain that plaintiffs Michael C. and Judith Ann Varjabedian will by reason thereof move from their property, then you may consider any damages that it is reasonably certain they will suffer from the loss of their Cal Vet loan." The submission of the issue to the jury as a question of fact was proper (*Zerbo v. Electrical Products Corp.* (1931) 212 Cal. 733, 735-736 [300 P. 825]), and the instruction requirement of "reasonable certainty" satisfied Civil Code section 3283. (Cf. *Bellman v. San Francisco H. S. Dist.* (1938) 11 Cal.2d 576, 588 [81 P.2d 894].)

The evidence supported the jury's conclusion as to the certainty of the future damages. Michael Varjabedian testified there was "no way" his family could stay on the farm, and the unsuitability of the premises for human habitation was confirmed by the testimony of Salaberry and at least one other witness. Furthermore, Military and Veterans Code section 987.2 (fn. 3, *ante*) was properly introduced as evidence that, if forced to move, the Varjabedians would lose the Cal-Vet loan. For the first time on its motion for new trial defendant offered an affidavit from an official of the Department of Veterans Affairs, which, while affirming that the Varjabedians would forfeit their loan if forced to move, also stated in part that "it is possible that a veteran's application for a new and different loan upon a different property would be favorably considered and granted." Whatever the probative value of this evidence on the issue of future damages, it should have been presented at trial.

The total amount of damages awarded for loss of the loan was adequately supported by testimony of plaintiff's expert, a banker, that this was the present value of the additional obligations the Varjabedians would incur if forced to refinance their farm. We do not find the amount excessive.[11]

For the above reasons, we affirm in its entirety that portion of the judgment which awards plaintiffs damages in nuisance.

---

[11]Defendant, for the first time in its reply brief, raises the argument that plaintiffs should have been required to minimize the damages involved in refinancing the Cal-Vet loan, either by selling their farm and purchasing another on which a Cal-Vet loan could be obtained, or by applying for a temporary waiver of the residency requirement as provided in Military and Veterans Code section 986.35. Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant. (*Hibernia Sav. and Loan Soc. v. Farnham* (1908) 153 Cal. 578, 584 [96 P. 9]; *Kahn v. Wilson* (1898) 120 Cal. 643, 644 [53 P. 24].) We therefore do not consider the issue here.

## IV

We turn now to plaintiffs' appeal from the judgment on the pleadings entered against their claim in inverse condemnation. Despite plaintiffs' successful nuisance recovery, we cannot say on the basis of the record before us that the challenged ruling, if erroneous, was necessarily harmless. (See, e.g., *Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 657 [131 Cal.Rptr. 646, 552 P.2d 430] (prejudgment interest); see also *id.* at pp. 651-656, and Code Civ. Proc., § 1036 (formerly § 1246.3) (recovery of certain litigation expenses).) We therefore reach the issue whether the court erred in denying plaintiffs' claim in inverse condemnation.

Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that "just compensation" be paid when "private property" is "taken or damaged for public use." In this case, the trial judge gave as his reason for denying compensation under this provision plaintiffs' failure to allege "physical damage to the property" or a "trespass." Defendant urges no other grounds in support of the judgment, and we consider none.

In assessing whether plaintiffs' allegations may serve as a basis for inverse liability, we note that physical damage to property is not invariably a prerequisite to compensation. (See *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659 [39 Cal.Rptr. 903, 394 P.2d 719]; *Southern Cal. Edison Co.* v. *Bourgerie* (1973) 9 Cal.3d 169 [107 Cal.Rptr. 76, 507 P.2d 964].) Rather, the determination of the scope of the just compensation clause rests on its construction " 'as a matter of interpretation and policy.' " (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441] (hereinafter *Holtz I*).) The contending policies which guide that construction have often been described as follows: " 'on the one hand the policy underlying the eminent domain provision in the Constitution is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements. . . . On the other hand, fears have been expressed that compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost.' " (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263 [42 Cal.Rptr. 89, 398 P.2d 129], quoting from *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818].)

Several factors present militate in favor of a distribution throughout the relevant community of the type of loss involved here.

Plaintiffs' claim stems from the recurring violation of their property by a gaseous effluent. As such, the injury is not far removed from those core cases of direct physical invasion which indisputably require compensation. (See, e.g., *Frustuck* v. *City of Fairfax* (1963) *supra*, 212 Cal.App.2d 345, 369-370; *Podesta* v. *Linden Irr. Dist.* (1956) 141 Cal.App.2d 38 [296 P.2d 401]; *United States* v. *Causby* (1946) 328 U.S. 256 [90 L.Ed. 1206, 66 S.Ct. 1062]; Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165, 1226-1229.) Thus, damage from invasions of water or other liquid effluents often provides the basis for inverse liability. (See, e.g., *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276 [289 P.2d 1]; *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628 [220 P.2d 897]; *Sheffet* v. *County of Los Angeles* (1970) 3 Cal.App.3d 720 [84 Cal.Rptr. 11]; *Ambrosini* v. *Alisal Sanitary Dist.* (1957) 154 Cal.App.2d 720 [317 P.2d 33].)[12] Moreover, plaintiffs' complaint which includes, inter alia, the claim that their land was made "untenantable for residential purposes" is clearly sufficient to depict a permanent and "substantial impairment" in their use of the land. (Cf. *Breidert* v. *Southern Pac. Co.* (1964) *supra*, 61 Cal.2d 659.)

At the same time, fears that "compensation . . . will seriously impede, if not stop" the beneficial construction of sewage treatment plants might be realized if courts were to award compensation for every objectionable odor, however insubstantial or widely dispersed, produced by such facilities. But the problem of reconciling this consideration with the competing policy of loss-distribution is not presented in its most difficult form by the appeal of the present judgment, since it appears from the Varjabedians' allegations that their property may have been peculiarly burdened by the odors so as to bring the case within the doctrine of *Richards* v. *Washington Terminal Co.* (1914) 233 U.S. 546 [58 L.Ed. 1088, 34 S.Ct. 654]. In *Richards* the plaintiff complained of "inconvenience . . . in the occupation of his property" caused by "gases and smoke" emanating from a nearby railroad. (*Id.* at p. 549 [58 L.Ed. at pp. 1089-1090].) The United States Supreme Court ruled that under the "taking" clause of the Fifth Amendment to the federal Constitution, the plaintiff could not recover for "those consequential damages that are necessarily incident to proximity to the railroad . . . ." (*Id.* at p. 554 [58

---

[12]While many of these cases involve permanent changes in the physical contours of land or physical damage to crops—not present here—these factors have not been regarded as indispensable in other cases in which recurring invasions of waters impair the use and thereby the value of property. (See *Dunbar* v. *Humboldt Bay Mun. Wat. Dist.* (1967) 254 Cal.App.2d 480 [62 Cal.Rptr. 358].)

L.Ed. at p. 1092].) Yet the landowner was entitled to compensation for "gases and smoke emitted from locomotive engines while in [a] tunnel, and forced out of it by means of [a] fanning system through a portal located so near to plaintiff's property that these gases and smoke materially contribute to injure the furniture and to render the house less habitable than otherwise . . . ." (*Id.* at p. 551 [58 L.Ed. at p. 1090].) Construing federal statutes immunizing the railroad from nuisance liability "in light of the Fifth Amendment" the court concluded "they do not authorize the imposition of so direct and peculiar and substantial a burden upon plaintiff's property without compensation to him." (*Id.* at p. 557 [58 L.Ed. at p. 1093]; see generally Stoebuck, Nontrespassory Takings in Eminent Domain (1977) pp. 156-158.)

Of course, *Richards* may be distinguished from this case with respect to the nature of the public facility involved, or on the ground that there is no device here which directs the noxious gases onto plaintiffs' property. However, such factual differences do not render the underlying principle of *Richards* inapplicable to the problem at hand, particularly when it is considered together with the California Constitution, which protects a somewhat broader range of property values from government destruction than does the analogous federal provision. (See *Reardon* v. *San Francisco* (1885) 66 Cal. 492, 501 [6 P. 317]; *Bacich, supra,* 23 Cal.2d at p. 350; Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power* (1967) 19 Stan.L.Rev. 727, 768-776.) If a plaintiff can establish that his property has suffered a "direct and peculiar and substantial" burden as a result of recurring odors produced by a sewage facility—that he has, as in *Richards,* been in effect "singled out" to suffer the detrimental environmental effects of the enterprise—then the policy favoring distribution of the resulting loss of market value is strong (*Holtz I, supra,* 3 Cal.3d at pp. 303-304) and the likelihood that compensation will impede necessary public construction is relatively slight. In these circumstances, the necessity of breathing noxious sewage fumes may be a burden unfairly and unconstitutionally imposed on the individual landowner.[13]

---

[13]Defendant relies on two cases in which inverse compensation was denied landowners who claimed damage from the construction of nearby freeways, including damage from fumes: *People* v. *Symons* (1960) 54 Cal.2d 855 [9 Cal.Rptr. 363, 357 P.2d 451], and *Lombardy* v. *Peter Kiewit Sons' Co.* (1968) *supra,* 266 Cal.App.2d 599. (*Lombardy* was disapproved in *Southern Cal. Edison Co.* v. *Bourgerie* (1973) *supra,* 9 Cal.3d 169, 175, to the extent inconsistent with that opinion.) However, in neither *Symons* nor *Lombardy* did the landowners' allegations reveal the possibility of "direct and peculiar and substantial" damage from fumes within the meaning of Richards. (See *Symons, supra,* at p. 860, discussed in *Breidert* v. *Southern Pac. Co.* (1964) *supra,* 61 Cal.2d at p. 666; *Lombardy,*

Here plaintiffs allege their farm was directly in the path of the odors as they were blown from defendant's facility by the prevailing winds. Plaintiffs should have been given the opportunity—through amendment of their pleadings if necessary (cf. *MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 815 [161 P.2d 449])—to demonstrate that the burden on their farm was sufficiently direct, substantial, and peculiar to come within the principle of *Richards,* as applied above. On that showing the Varjabedians can base a claim in inverse condemnation.[14] It follows that the trial court's judgment on that count must be reversed. (See *Dragna* v. *White* (1955) 45 Cal.2d 469, 470 [289 P.2d 428]; *Chas. L. Harney, Inc.* v. *Contractors' Bd.* (1952) 39 Cal.2d 561, 565 [247 P.2d 913].)

The judgment is amended by adding thereto a paragraph dismissing the fourth cause of action of the complaint (inverse condemnation) and awarding judgment thereon to defendant. The portion of the judgment thus added is reversed. The remainder of the judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Thompson (Homer B.), J.,* concurred.

The petition of the defendant and appellant for a rehearing was denied January 5, 1978. Bird, C. J., did not participate therein.

---

*supra,* at pp. 602-603, 605.) *Symons* (at p. 860) specifically denied recovery for "the *general* diminished property values due to the construction of the freeway . . . ." (Italics added.)

[14]Indeed, we note that evidence was taken at the trial on the nuisance theory which tended to show that the stench of which the Varjabedians complain did not affect other surrounding properties.

*Assigned by the Chairperson of the Judicial Council.